The relief described hereinbelow is SO ORDERED.

Signed June 18, 2009.



_____
ROBERT D. BERGER
United States Bankruptcy Judge
_____

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF KANSAS

**In re:**

| | |
|---|---|
| **JAMES JOSEPH COX and** | **Case No. 04-20720** |
| **SHIRLEY ANN COX,** | |
|         **Debtors.** | **Chapter 13** |

| | |
|---|---|
| **JAMES JOSEPH COX and** | |
| **SHIRLEY ANN COX,** | |
|         **Plaintiffs,** | |
|     **v.** | **Adv. No. 05-6007** |
| **COUNTRYWIDE HOME LOANS, INC., et al.,** | |
|         **Defendants.** | |

## MEMORANDUM OPINION AND ORDER
## ON CROSS MOTIONS FOR SUMMARY JUDGMENT

Cross Motions for Summary Judgment are before the Court.[1] Plaintiffs/Debtors James

and Shirley Cox (hereinafter also referred to as "James" and "Shirley") seek a declaration

---

[1] Doc. Nos. 78 and 94. Plaintiffs James J. Cox and Shirley A. Cox appear by Cynthia F. Grimes. Defendant Countrywide Home Loans, Inc., appears by Thomas M. Martin and Richard A. Wunderlich.

invalidating a lien against their homestead, alleging Shirley Cox's signature on the mortgage is a forgery. Defendant Countrywide Home Loans, Inc. ("Countrywide"), seeks summary judgment because Debtors jointly consented to granting a mortgage and, having received the benefits of the loan, are now estopped from denying Shirley's consent. The Court finds Shirley Cox consented to the mortgage, but the written mortgage fails because Shirley's signature was forged. Countrywide is granted an equitable lien on Debtors' homestead.

**Findings of Fact**

The Debtors James and Shirley Cox are husband and wife and, together with James's father, own a residence in Gardner, Kansas. The residence has been Debtors' homestead since 1993. Debtors filed for bankruptcy on March 3, 2004. Prior to filing, Shirley had amassed $100,000.00 in credit card debt unbeknownst to her husband. When James found out, the couple together went to debt consolidation counseling and eventually agreed to refinance their residence. Both James and Shirley testified they decided together to refinance their house to pay off James's truck loan, which would free approximately $400 to $500 in their monthly budget, and to apply the rest to Shirley's debts. They met twice with a mortgage broker, Nick Elliott, to discuss the process. Elliott was not a stranger to Debtors. He had been their wedding photographer, and Debtors were comfortable enough with him to share a beer with him and confide in him about Shirley's credit problems. Debtors were concerned Shirley's credit card debts would make them ineligible to refinance. Shirley testified, "we simply asked [Elliott] if it was possible to refinance the house in James' name alone because we didn't think that it would be possible with my name on there."[2] Debtors did not want Shirley's credit problems to impede

---

[2] Shirley A. Cox, Depo. 9:5-8, April 11, 2006.

-2-

09.06.18 Cox v Countrywide SJ.wpd

Case 05-06007    Doc# 124    Filed 06/18/09    Page 2 of 20

them in refinancing with a lender. As to the refinancing, Shirley testified:

> Q. You wanted to get this refinancing done; is that correct?
> A. I wanted whatever was going to help us through a trying time.
> Q. And this refinancing was what was going to help you through the time?
> A. We thought it would help, yes.
> Q. So you wanted to get this loan done?
> A. Yes.
> Q. And you were willing to do whatever you needed to do to get it done; is that fair to say?
> A. Yeah, that's fair.[3]

On March 26, 2003, Debtors met with Elliot and two unidentified men at the offices of Foxhill Mortgage. Debtors knew the purpose of the meeting was to close on a refinancing loan on their home. Shirley was present and available to sign the loan documents. She even asked if there was anything she needed to sign, but the men said no. Shirley testified she would not have objected to signing documents to obtain the loan. She did not sign any documents at closing. The documents presented to James were drawn in his name only. A day or two later, Shirley did sign a settlement statement which identified the loan, identified both James and Shirley as the borrowers, and itemized the proceeds to be delivered as a result of the refinancing. When asked about the cash proceeds, Shirley testified, " I knew that it was approximately 30,000 or more was the excess that *we* were taking into *our* mortgage, yes."[4] Shirley also endorsed the check for the proceeds made payable to both her and James. The check was for $37,100.19.

First Magnus Financial Corporation was the original lender. The promissory note is in the principal amount of $101,600.00. The loan proceeds paid: (1) a prior mortgage lien on the property in the amount of $58,306.30; (2) Debtors $37,100.19; and (3) costs and fees of $6,193.51 (comprised of insurance, taxes, appraisal fee, broker fee, and various other fees).

---

[3] Shirley A. Cox, Depo. 17:12-23.
[4] Shirley A. Cox, Depo. 16:23-25 (emphasis added).

A mortgage was recorded on April 2, 2003. The recorded mortgage is in both James's and Shirley's names and bears the notarized signature of Shirley Cox. The parties agree Shirley's signature is a forgery; however, the parties offer no evidence as to who may have perpetrated the forgery. James and Shirley deny any knowledge with respect to who may have committed the forgery. Their denial is not controverted. The notary who acknowledged Shirley's signature testified she did not actually witness Shirley sign the mortgage.

First Magnus assigned the note and mortgage to Countrywide. There is no evidence Countrywide took the assignment with knowledge of any irregularities in the closing. Debtors made loan payments to Countrywide for approximately 11 months from a joint checking account. Debtors and Countrywide both received loan closing files documenting the transaction. Debtors' closing file contains documents which do not have Shirley's name on them. Some of the documents in Debtors' file differ from documents in Countrywide's file, and the files do not contain all the same documents. Debtors cite many other discrepancies between the folders which show the closing was irregular; however, these particular discrepancies are not material to the validity of the alleged lien.[5]

The Debtors' challenge to the mortgage came about when Shirley sought legal advice about filing bankruptcy without James. When her lawyer told her she could not file without her husband because her name was on the mortgage, Shirley explained to counsel her name was not on the mortgage. Neither James nor Shirley testified in their depositions they were challenging the mortgage because Shirley did not consent. Shirley's testimony in this regard is as follows:

    Q.    You want to have the mortgage declared invalid; is that correct?

---

[5] Debtors may have other remedies, but the issue here is the validity of the lien procured without one spouse's signature on the mortgage.

| | |
|---|---|
| A. | Because it's our understanding that it is invalid. |
| Q. | And what is your understanding as to why it's invalid? |
| A. | Because I didn't sign the mortgage. My name isn't on there – wasn't on there. |
| Q. | You would have signed if somebody had asked you to sign; correct? |
| A. | Yes, I would have. |

\*   \*   \*

| | |
|---|---|
| Q. | You wanted to obtain the refinancing; is that fair to say? |
| A. | Yes.[6] |

## Conclusions of Law

### A.  Summary Judgment Standard.

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, and other matters presented to the court show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.[7] Only genuine disputes over "material facts" can prevent summary judgment.[8] Cross motions for summary judgment allow the court to assume the only evidence to be considered has been submitted with the pleadings. However, cross motions are to be considered independently, and summary judgment is not appropriate if disputes remain as to any material fact.[9] The court resolves any conflicting inferences drawn from undisputed evidentiary facts. All inferences are to be construed in favor of the non-moving party.[10] Only when reasonable minds could not differ as to the import of the proffered evidence is summary judgment proper.[11]

---

[6] Shirley A. Cox, Depo. 23:20-24:7, 24:10-12.
[7] FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).
[8] *Id.* at 248.
[9] *Atlantic Richfield Co. v. Farm Credit Bank of Wichita,* 226 F.3d 1138, 1148 (10th Cir. 2000).
[10] *Id.*
[11] *Anderson,* 477 U.S. at 250-51.

-5-

09.06.18 Cox v Countrywide SJ.wpd

### B. The Requirement of Joint Consent and Whether Consent Must be in Writing for the Valid Mortgage of a Kansas Homestead.

The Kansas Constitution requires the joint consent of husband and wife for any alienation of the homestead.

> A homestead to the extent of . . . one acre within the limits of an incorporated town or city, occupied as a residence by the family of the owner, together with all the improvements on the same, shall be exempted from forced sale under any process of law, and shall not be alienated without the joint consent of husband and wife, when that relation exists.[12]

Joint consent is best evidenced by a written contract executed by both the husband and wife; however, consent need not always be written to make a valid mortgage between a mortgagee and a husband and wife. In the early days of statehood, the Kansas Supreme Court found a homestead mortgage not signed by one spouse was void.[13] However, the Kansas Supreme Court later abandoned the strict requirement of a writing, stating:

> The constitution of the state does not in express terms require the alienation of the homestead by the joint consent of husband and wife, when that relation exists, to be evidenced by a writing; and hence the consent of the wife to the grant or alienation . . . may be shown by such evidence as is deemed necessary to establish any other material fact.[14]

A husband's and wife's joint consent to alienate their homestead may be proven by parol evidence and by the circumstances surrounding the alienation. A husband and wife cannot deny their joint consent when their own words and actions show they willingly entered into the transaction.[15] For example, a couple could not deny the validity of a lease to farm the homestead

---

[12] KANSAS CONST. art. 15, § 9; *see also* K.S.A. §60-2301.

[13] *Morris v. Ward*, 5 Kan. 239 (1869); *Jenkins v. Simmons*, 37 Kan. 496, 15 P. 522 (1887).

[14] *Dudley v. Shaw*, 44 Kan. 683, 687, 24 P. 1114, 1116 (1890) (quoting *Pilcher v. Railroad Co.*, 38 Kan. 516, 16 P. 945 (1888)).

[15] *Sullivan v. City of Wichita*, 64 Kan. 539, 543, 68 P. 55, 57 (1902) (citing *Perrine v. Mayberry*, 37 Kan. 258, 15 P. 172 (1887)).

-6-

09.06.18 Cox v Countrywide SJ.wpd

based on the absence of the wife's signature on the written lease when the wife acquiesced to the tenant's possession and cultivation of the homestead land for over a year.[16] A gas line easement remained enforceable after the gas company entered the homestead with the express oral consent of both owners and laid its pipeline at great expense.[17] The court enforced the sale of the homestead where sufficient part performance by the vendee was shown by his taking possession of the homestead after the wife surrendered the keys.[18] The husband's words and the wife's actions evidenced the joint consent of the husband and wife and removed the transaction from the statute of frauds.[19]

Arguing Kansas law requires a writing, Debtors invoke an infrequently cited statute which provides:

> No action for the specific performance of a *contract for the sale or exchange* of real estate in the state of Kansas or for damages by reason of the violation of any *contract to sell or exchange* lands within the state of Kansas, as occupied as a homestead by the owner and his or her family, shall be maintained unless the *contract of sale* is signed by both the husband and wife, or by an agent or broker duly authorized in writing by both the husband and wife to make such sale or exchange. (Emphasis added.)[20]

The statute is a statute of frauds which provides additional protection before one is divested of title to his or her homestead.[21] Although §60-2303 has been law since 1905, it has only been cited by a few cases.[22] The statute has never been cited in connection with a mortgage, lease, or

---

[16] *Johnson v. Samuelson*, 69 Kan. 263, 269-70, 76 P. 867, 869 (1904) ("The Constitution of this state requires joint consent to an alienation, not a joint act of alienation.").
[17] *Ralston v. Wichita Nat. Gas Co.,* 81 Kan. 86, 105 P. 430 (1909).
[18] *Eakin v. Wycoff,* 118 Kan. 167, 234 P. 63 (1925).
[19] *Id.*
[20] K.S.A. § 60-2303 (previously 60-3503).
[21] *Hughes v. Cressler,* 130 Kan. 533, 287 P. 271 (1930).
[22] *Id.; Cole v. Coons,* 161 Kan. 332, 167 P.2d 295 (1946); *Hough v. Munford,* 160 Kan. 572, 164 P.2d 92 (1945); *Tucker v. Finch,* 106 Kan. 419, 188 P. 235 (1920); *Martin v. Hush,* 91 Kan. 833, 139 P. 401 (1914).

09.06.18 Cox v Countrywide SJ.wpd

any other alienation other than a divestiture of title. The plain language of the statute is limited in its wording to a "contract of sale." The statute does not attempt to include all possible alienations or conveyances of the homestead in its language as is the case with the Kansas Constitution and K.S.A. §60-2301.[23] According to the statute's plain language and the lack of authority applying the statute to mortgages, §60-2303 does not apply in this case. Even if it did apply, it would not prohibit another equitable remedy besides specific performance such as equitable subrogation or an equitable lien.

The general statute of frauds which requires a writing for contracts regarding real estate is applicable to homesteads.[24] Statutes of frauds are to prevent frauds, not to enable a person to undo a promise. Thus, Kansas law recognizes exceptions to the requirement of a written contract.[25] If the couple intended to incur a debt and pledge their real property as security for the obligation, Kansas will recognize an equitable mortgage even though the written contract may not be enforceable.[26] Where the writing fails, Kansas also recognizes equitable subrogation

---

[23] The constitutional homestead exemption is codified.

[24] K.S.A. § 33-106; *Hough v. Munford,* 160 Kan. at 572; *Thompson v. Millikin,* 102 Kan. 717, 172 P. 534 (1918) (homestead deed and lease void without husband's knowledge).

[25] *See Hill v. Hill,* 185 Kan. 389, 345 P.2d 1015 (1959) (son held equitable purchase money mortgage despite lack of wife's signature on document); *Eakin v. Wycoff,* 118 Kan. at 167 (sufficient part performance takes homestead case out of statute of frauds).

[26] *Hill,* 185 Kan. at 396; *Garnett State Sav. Bank v. Tush,* 232 Kan. 447, 454, 657 P.2d 508 (1983); *Fuqua v. Hanson,* 222 Kan. 653, 655-56, 567 P.2d 862 (1977).

-8-

09.06.18 Cox v Countrywide SJ.wpd

based upon unjust enrichment.[27]  Part performance and equitable estoppel likewise have been held to justify enforcement of a contract not evidenced by a complete writing.[28]

In summary, joint consent is required to mortgage a Kansas homestead.  Joint consent is best evidenced by a writing, but such consent need not be in writing if it can be proven by circumstances surrounding the alienation.  Neither §33-106 nor §60-2303 prohibit the creation of a valid mortgage as between the parties when the equities of the case require its enforcement.

### C. Shirley Cox Consented to the Mortgage.

Consent is not a real issue in this case.  James and Shirley Cox, at all times, jointly consented to pledge their homestead as security for a $101,600.00 loan.  Debtors testified they thought about refinancing; they discussed refinancing; and they agreed to seek refinancing.  Shirley actively joined in all discussions and meetings.  Debtors wanted to refinance to pay off a prior encumbrance, pay off a truck loan, and to reduce significantly Shirley's credit card debt, all for their mutual benefit.  Shirley, in particular, "wanted whatever was going to help us through a trying time."  The deposition transcripts evidence a couple in sync and in partnership to address jointly their debts, first by seeking debt consolidation counseling and then by meeting with Elliott to explore refinancing.  Elliott was not a stranger to them.  Although Debtors profess themselves naive as to mortgage transactions, they knew enough to want to keep Shirley's credit

---

[27] *Hofman v. Demple*, 52 Kan. 756, 35 P. 803 (1894); *Nat'l City Mortgage Co. v. Ross,* 34 Kan. App. 2d 282, 117 P.3d 880 (2005); *Crippen v. Chappel,* 35 Kan. 495, 11 P. 453 (1886); *Kuske v. Staley,* 138 Kan. 869, 28 P.2d 728 (1934) (where money was obtained on forged mortgage and used to pay off existing encumbrance, holder of forged mortgage is entitled to be subrogated to the rights of holder whose indebtedness was paid); *Newcomer v. Sibon,* 119 Kan. 358, 239 P. 1110 (1925) (where security given for a loan, which is used to pay off a prior encumbrance, turns out to be void, the holder will be subrogated to the rights of the holder whose lien was paid); *Zinkeisen v. Lewis,* 63 Kan. 590, 66 P. 644 (1901).

[28] *Eakin,* 118 Kan. at 167; *Shay v. Bevis Rock Salt Co.,* 72 Kan. 208, 83 P. 202 (1905) (couple equitably estopped from asserting lease to mine salt from their homestead was invalid because they failed to object for several years while miner incurred costs).

-9-

09.06.18 Cox v Countrywide SJ.wpd

report from their prospective lender *for fear they would not get the loan - not because Shirley did not consent*. Shirley herself testified the mortgage was prepared in James's name alone because Debtors did not think a refinance would be possible if Shirley's name were included. Shirley agreed to do whatever was necessary to get the loan. If her credit history would thwart the process, she would stay off the loan documents. If she had been asked to sign the loan documents, she would have. She signed the settlement statement and endorsed the check. Debtors paid the mortgage from a joint checking account for 11 months. Even in her 2006 deposition, Shirley casually referred to the cashed out equity she and James "were taking into *our* mortgage." Debtors' words and actions show Shirley consented to the mortgage. Kansas law would recognize an equitable mortgage as between these parties unless the equities of the case bar its enforcement.

> **D.     Counter-Balancing Equities in Determining Whether to Enforce an Equitable Lien in Spite of a Forged Mortgage.**

Because Shirley at all times, in complete agreement with her husband, agreed to encumber their homestead, the real issue in this case is whether to invalidate her intention because of the forgery. Three cases worth discussing from outside Kansas have weighed the counter-balancing equities of a forgery versus the debtors' unjust enrichment and estoppel in determining whether to declare an equitable mortgage.

The first is an unpublished decision from a Michigan bankruptcy court addressing whether an equitable mortgage could be granted when the written mortgage was proven to have been forged. *In re Sutter,* Case No. 05-38115, Doc. No. 213 (Bankr. E.D. Mich. April 3, 2009) (J. Opperman). The debtors, with historically bad finances, sought to refinance their home. Although their first application was denied, debtors finally found a broker who would close a

-10-

transaction. Both debtors appeared at the closing and signed many documents. The debtors admitted they would have executed a mortgage had one been provided to them; however, apparently a mortgage was not presented. The debtors began making payments to the loan originator's assignee. Less than a year later, debtors defaulted. The debtors then discovered a mortgage had been recorded with their forged signatures, so they challenged its validity in their bankruptcy proceedings. The court granted the assignee an equitable mortgage because it found the debtors intended to pledge their home as security for the new loan. Although troubled by the forgery, the court stressed it was not relying on the forged mortgage to provide an equitable remedy to the mortgagee. Rather, the court based its remedy on traditional equitable principles that what was agreed to be done and should have been done will be treated as if the acts contemplated by the parties had been done at the beginning of the transaction so as to promote substance over form.[29] An equitable mortgage will be imposed if an intention to place a lien on the real estate is shown but for some reason the intended purpose was not accomplished. This is also the law of Kansas.[30]

*Sutter* also discussed whether the loan originator's alleged unclean hands in perhaps perpetrating the forgery barred its assignee from receiving an equitable remedy. The court decided it did not. The assignee was not shown to have had knowledge of any irregularity with the document, and the debtors themselves were unaware they had a legal challenge to the mortgage until they reviewed the document. The court found the equities tipped in favor of the

---

[29] *In re Sutter,* Case No. 05-38115, Doc. No. 213 at 9, citing *Schram v. Burt,* 111 F.2d 557 (6th Cir. 1940).
[30] *Hill,* 185 Kan. at 400; *Garnett State Sav. Bank,* 232 Kan. at 453-54; *Fuqua*, 222 Kan. at 655-56.

innocent assignee who, for value, received the rights of a transaction which was agreed to in substance and partially performed by the debtors even though the mortgage was not executed.[31]

The second case comes from a Minnesota bankruptcy court facing similar facts. *Holmes v. Deutsche Bank Nat'l Trust Co. (In re Holmes),* 403 B.R. 634 (Bankr. D. Minn. 2009). A husband and wife decided to refinance. The couple faced precarious financial circumstances, and their mortgage broker was not sure they could ever close a loan. The mortgage broker worked with the couple, and the parties eventually reached an agreement. Before the closing, however, the husband was incarcerated. The mortgage broker sent a notary to the couple's home for signatures. The notary took the wife's signature and included a note in the file stating the husband was not present. The mortgage broker, although aware of the husband's incarceration, never sent a notary or any papers to the husband in prison. After the loan closed, the couple knew the husband had not executed the loan documents. They discovered the husband's signatures had been forged, and a forged mortgage recorded. The court did not know the identity of the forger. A Minnesota statute states: "If the owner is married, no conveyance of the homestead, except a mortgage for purchase money . . . shall be valid without the signatures of both spouses."[32] Minnesota law, more definitively than Kansas, states a mortgage is absolutely void unless it is in writing signed by both spouses.[33] Thus, under the Minnesota statute, the residential mortgage on which the husband's signature had been forged was held not effective to convey any interest in the homestead to the lender.[34]

---

[31] *In re Sutter,* Case No. 05-38115, Doc. No. 213 at 11.
[32] MINN. STAT. §507.02.
[33] *Holmes,* 403 B.R. at 641.
[34] *Id*. at 642.

09.06.18 Cox v Countrywide SJ.wpd

Further, the lender could not rely on ratification or estoppel theories to circumvent an express statute requiring both spouses' signatures on a mortgage instrument. The court determined the mortgage broker must have known about the forgery because he knew no documents were sent to the husband in prison. Thus, the mortgage broker's presumed knowledge constituted unclean hands and kept the lender from being an innocent party entitled to equitable relief. The court refused to allow the lender to be equitably subrogated to the rights of the prior lien holder.[35]

The third case, from Wisconsin, involves a single homeowner who wanted to refinance his residence. *Security Pacific Nat'l Bank v. Ginkowski,* 410 N.W.2d 589 (Wis. Ct. App. 1987). The homeowner intended to pledge his home as security for refinancing and executed all the loan documents except the mortgage. The case does not explain why his signature on the mortgage was overlooked. After the closing, the mortgagee's agent authorized an employee to forge the mortgagor's signature, and the agent notarized it. When the forgery was discovered, the mortgagor raised a statute of frauds defense to the lender's action to reform the mortgage.[36] The mortgagor argued the mortgage was invalid because he never signed it and never intended to sign it. The controlling Wisconsin statute in this case allowed equitable relief to reform a mortgage provided the grantor is proven to have agreed to the transaction.[37]

The court held for the lender. The court found clear and satisfactory evidence of the mortgagor's agreement to grant the mortgage. The court also found the forgery did not cause any harm from which the lender sought relief. Although the forgery was wrongful, the forgery

---

[35] *Id.* at 646.
[36] *Security Pacific Nat'l Bank,* 410 N.W.2d at 591.
[37] WIS. STAT. §706.04.

-13-

09.06.18 Cox v Countrywide SJ.wpd

Case 05-06007   Doc# 124   Filed 06/18/09   Page 13 of 20

did not constitute unclean hands so as to bar equitable relief because the parties had contemplated an agreement all along in which the borrowed money would be secured with a mortgage.[38] The lender readily acknowledged the forgery and sought relief because the mortgagor's assent was present, even if his signature was not.[39]

Although not directly on point, Kansas cases have dealt with equitable considerations when forgery or fraud is involved. An early case involved a husband who forged his wife's name on a mortgage to obtain a loan without her knowledge or consent. *Howell, Jewett & Co. v. McCrie,* 36 Kan. 636, 14 P. 257 (1887). The notary who acknowledged the wife's signature outside her presence later visited the wife to obtain her signature. The court refused to allow the invalid mortgage to be ratified by the wife's subsequent signature. The court found the wife's signature was obtained not by joint consent, but by her fear her husband would be prosecuted for forgery. The court acknowledged the mortgagee was innocent since he had no knowledge of the fraud; however, the court refused to allow the criminal act of forgery to be ratified for any purpose. The Kansas Supreme Court stated, "We cannot conceive of any state of facts, or any chain of circumstance, *except it possibly be by estoppel*, whereby any person can acquire any interest, estate or lien upon real estate by an instrument to which signatures are forged." (Emphasis added.)[40]

Estoppel has allowed an innocent mortgagee to acquire an interest in a homestead upon a forged mortgage.[41] In *Zinkeisen*, the husband forged his wife's signature on a homestead mortgage in order to pay off prior encumbrances. Almost immediately, the wife was informed of

---

[38] *Security Pacific Nat'l Bank,* 410 N.W.2d at 593.
[39] *Id.*
[40] *Howell, Jewett & Co. v. McCrie,* 36 Kan. at 654.
[41] *Zinkeisen,* 63 Kan. at 592; *Newcomer,* 119 Kan. at 358.

-14-

09.06.18 Cox v Countrywide SJ.wpd

the forgery. She was also informed the money obtained paid off the prior encumbrances. She knew her husband made interest payments on the note secured by the forged mortgage. The court found the mortgagee was entitled to be subrogated to the rights and interests of the prior mortgagee.[42] Likewise, in *Newcomer*, the husband's forgery did not keep the mortgagee from being subrogated to the rights of the prior mortgagee whose valid mortgage he satisfied.[43] In *Kuske,* another case involving a married couple and a forged mortgage, the identity of the forger was not known or revealed.[44] The court found the mortgagee who loaned money to pay off a prior valid lien, but whose mortgage turned out to be void, was subrogated to the rights of the prior, valid mortgagee.[45] In these cases, the court approved equitable remedies without ratifying the forgeries.

Even a party guilty of fraud has been granted an equitable remedy under Kansas law. In *Hofman,* a wife executed a deed under duress and claimed to have done so upon the grantee's fraud.[46] The trial court cancelled the deed, but subrogated the grantee to the rights of the original mortgagee so as to allow the grantee to recover his payment of the prior mortgage and tax liens. The court found the wife estopped from obtaining the full relief she sought, which included return of the homestead free and clear of the liens paid by the grantee. The court noted the wife, having allowed the grantee to pay the mortgage and tax liens before complaining about the fraudulently obtained deed, would be unjustly enriched by recovering her homestead freed of the prior encumbrances.[47]

---

[42] *Zinkeisen,* 63 Kan. at 592.
[43] *Newcomer,* 119 Kan. at 358.
[44] *Kuske,* 138 Kan. at 869.
[45] *Id.* at 732.
[46] *Hofman*, 52 Kan. at 756.
[47] *Id.*

-15-

09.06.18 Cox v Countrywide SJ.wpd

On the other hand, a party invoking equity must show himself vigilant and careful in protecting his own rights.[48] In *Ayres,* a husband and wife executed a blank mortgage. An agent later filled in the grantee, land description, and consideration, but contrary to the wife's instructions. The court refused to employ estoppel against the wife. The wife successfully challenged the mortgage because the mortgagee had full knowledge of the wife's true intentions before he parted with his money. Where a person allows himself to be defrauded, he is generally allowed to suffer the consequences.[49]

### E.   Discerning the Limits of Applying the Clean Hands Doctrine.

The clean hands doctrine does not automatically bar an equitable remedy under Kansas law even though there has been a forgery. The clean hands doctrine is based on the maxim that one who seeks equity must not himself be guilty of inequitable conduct.[50] The clean hands doctrine is not a binding rule, but is to be applied in the sound discretion of the court.[51] Not every reprehensible act will preclude a litigant from obtaining equitable relief.[52] The wrong must have directly caused the harm from which the litigant seeks relief. The clean hands doctrine is not properly invoked where the objectionable act does not affect the equitable relations existing between the parties.[53] The Kansas Supreme Court has stated:

> It should also be emphasized that in applying the clean hands maxim, courts are concerned primarily with their own integrity. The doctrine of unclean hands is derived from the unwillingness of a court to give its peculiar relief to a suitor who in the very controversy has so conducted himself as to shock the moral sensibilities of the judge. It

---

[48] *Ayres v. Probasco,* 14 Kan. 175 (1875).
[49] *Id.* at 189-90.
[50] *Fuqua,* 222 Kan. at 656-57.
[51] *Id.* at 657.
[52] *Brooks v. Weik,* 114 Kan. 402, 410, 219 P. 528, 532 (1923).
[53] *Id.*

-16-

has nothing to do with the rights or liabilities of the parties. In applying the unclean hands doctrine, courts act for their own protection, and not as a matter of 'defense' to the defendant.[54]

In *Brooks* and *Fuqua* for example, alleged fraud on the part of the plaintiffs, one seeking rescission and the other seeking foreclosure of an equitable mortgage, was held not to bar the equitable remedies because the alleged fraud did not work any inequity in the challenged transactions.[55] In other words, the defendants were not directly harmed by the fraud in the context of the challenged transactions. While there may be separate claims for damages caused by a plaintiff's fraudulent conduct, the clean hands doctrine does not automatically bar an equitable remedy. For example, a wife defrauded by forged and materially altered loan documents was entitled to damages caused by the mortgage broker's fraud; however, the lender was still entitled to be equitably subrogated to the prior mortgagee's lien which it satisfied as part of the transaction.[56] The victim of fraud is not entitled to a windfall.[57] Equity is not served by returning previously encumbered property freed of all liens to the victim of fraud. If the property was encumbered before the tainted transaction, the victim does not suffer if the property is returned similarly encumbered.[58]

Further, as in *Sutter* and *Security Pacific Nat'l Bank*, lenders may be granted equitable relief despite the existence of forgeries when the lenders performed their part of the contract without knowledge of any irregularities with their respective transactions, and the grantors were

---

[54] *Green v. Higgins,* 217 Kan. 217, 221, 535 P.2d 446 (1975).
[55] *Brooks,* 114 Kan. at 410-11*; Fuqua,* 222 Kan. at 656-57.
[56] *Welch v. Centex Home Equity Co., LLC,* 178 P.3d 80, 2008 WL 713690 (Kan. Ct. App. 2008) (unpublished).
[57] *Hofman*, 52 Kan. at 756.
[58] *New v. Smith,* 94 Kan. 6, 145 P. 880 (1915).

proven to have agreed to the substance of the transactions. The forgeries notwithstanding, the grantors received the benefit of their bargains. Equity does not disturb this result.

### F. Countrywide is Entitled to an Equitable Mortgage on Debtors' Homestead.

Countrywide is entitled to an equitable mortgage on Debtors' homestead. Applying the law to the facts of this peculiar case, the Court finds the forgery caused no harm to Debtors so as to bar an equitable remedy for Countrywide. Debtors were not cheated. Debtors do not complain the agreement to mortgage their homestead was performed in a manner inconsistent with their stated intention. Debtors received the loan, the monthly payments, the interest rate, and cashed out equity they requested in exchange for a lien on their home. They allowed a prior mortgage to be satisfied not only for their benefit, but for the benefit of James's father. Yet, Debtors request to be relieved from the obligations normally accompanying the benefits they wanted and received. To deny an equitable mortgage would provide Debtors a windfall and charge Countrywide in excess of $101,600.00 as a punitive fine for the act of an unknown forger. The punishment exceeds the crime and is imposed against a party who has not been proven guilty. Such an outcome is not equitable because Debtors were not defrauded by the forgery; Countrywide was. The evidence shows Debtors consented to the mortgage. Also, Debtors were better acquainted with Elliott than Countrywide, so it is not fair to charge only Countrywide with his errors. Debtors and Elliott knew Shirley was not creditworthy and prepared documents in James's name only to obtain the loan. Such documentation was wrong, albeit perhaps unknown to Debtors and apparently to Elliott. But, Debtors benefitted from the forgery. Debtors intended to enter into a valid mortgage, and they obtained a loan on the basis of their stated intention and the forged mortgage. Sometime between James signing the loan documents and disbursement of

09.06.18 Cox v Countrywide SJ.wpd

the loan proceeds, someone determined the mortgage needed to include Shirley's name and signature. As noted in *Holmes*, someone should have returned to Debtors for the proper signatures. That did not happen, but Debtors signed the settlement statement, endorsed the check, and made payments for 11 months. Debtors are thus estopped from denying the transaction they embraced during their trying time.

Under Kansas law, the forgery only defeats the writing; it does not eviscerate Debtors' consent nor does it disturb the substance of this transaction. The forgery is not Debtors' injury to bear. This case is more analogous to *Sutter* and *Security Pacific Nat'l Bank* because Debtors' consent is proven and the substance of the transaction was not disturbed by the forgery. Kansas law allows an equitable remedy despite the failure of the writing and despite the existence of the forgery. The forgery cannot be condoned, but in the overall balance of the equities of this case, it cannot bar Countrywide from an equitable mortgage.

## Conclusion

The cross motions for summary judgment show there are no genuine issues of material fact. Debtors and Countrywide's predecessor intended to enter into a loan agreement secured by a lien in Debtors' homestead. Although the written mortgage fails, this Court, as a court of equity, effectuates the parties' intent and grants Countrywide an equitable mortgage in Debtors' homestead.

IT IS THEREFORE ORDERED Defendant's motion for summary judgment is GRANTED. Debtors' cross motion for summary judgment is DENIED. A separate order of judgment in Defendant's favor will be entered.

-19-

###

ROBERT D. BERGER
U.S. BANKRUPTCY JUDGE
DISTRICT OF KANSAS